**UNDER SEAL**

FILED
CHARLOTTE, NC

MAY 16 2023

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Colorado Case No.: 23-mj-00093-KLM

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 3:23-CR-119-FDW |
| ) | |
| ) | **BILL OF INDICTMENT** |
| v. ) | |
| ) | 18 U.S.C. § 1349 |
| ) | |
| RICHARD PAUL NOLAN ) | |

THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

**Background**

1. "Pop-ups" were computer coding scripts of a malicious nature, embedded in various internet websites, that temporarily locked computer users' computers and displayed a message directing victims to contact a toll-free number of technical assistance for removal. Pop-ups often included inflammatory and misleading representations of diagnosing systemic network infirmities, including viruses and instances of unauthorized network intrusions, all in an effort to trick victims into seeking costly technical assistance from call centers.

2. "Tech-support fraud" were multi-level operations that involve material misrepresentations of viruses or other network infirmities on victims' computers through pop-ups. When victims contacted call centers through the phone numbers presented by the pop-ups, call center employees would then defraud the consumers under the auspices of providing technical assistance to resolve any number of fictitious issues falsely identified on the victims' computers.

3. "Publishers" were companies that created and distributed these malicious pop-ups on websites across the internet. Call centers paid per-call fees to publishers, brokers, and their intermediaries in order to purchase victim call traffic routed to their call centers by the numbers displayed on the pop-ups.

4. Tech-support fraud required the use of call-routing services. These entities operated "pay-per-call" platforms that tracked tech-support fraud calls from their points of origin (the victims) to the destination phone numbers (the call centers), recording the calls along the way.

1

5. RICHARD PAUL NOLAN was the owner/operator of TrackDrive, a call-routing platform that offered pay-per-call services to publishers and call centers for tech-support fraud. The TrackDrive platform routed victim calls to call centers that resulted from malicious tech-support fraud pop-ups. Many different publishers and call centers paid NOLAN to use the TrackDrive platform to route tech-support fraud calls. At all times relevant to this Bill of Indictment, NOLAN resided in Colorado Springs, Colorado.

6. Company-1, along with its affiliated entities (collectively hereinafter "Company-1"), was a publisher that published malicious pop-ups as a means of generating victim call traffic to be sold to call centers. Company-1 used NOLAN's call routing platforms to route victim calls generated by its pop-ups. Company-1 used middleman brokers to sell its call traffic to call centers.

7. Individual-1 was the owner and manager of various call center companies headquartered in Charlotte, North Carolina, within the Western District of North Carolina. Individual-1 operated tech-support fraud call centers based on the New Delhi area of the Republic of India.

## The Tech-Support Fraud Scheme

8. Beginning in 2016, NOLAN conspired with malicious pop-up publishers such as Company-1, call centers, call traffic brokers, and others known and unknown to the Grand Jury to engage in tech-support fraud. Various independent call centers, such as the call center operated by Individual-1, purchased victim call traffic from the conspirators. In other words, call centers paid NOLAN and the pop-up publishers to cause victims to believe that their computers required technical support through the use of malicious pop-ups, and for NOLAN to route the victim calls to the call centers. Victims throughout the United States were defrauded of tens of millions of dollars by call centers on calls routed by NOLAN's routing platform. Company-1 and NOLAN collectively profited well over $30 million from this scheme. Because NOLAN's call routing platform was a pay-per-call system, NOLAN was compensated for each tech-support fraud call that traversed his platform. NOLAN personally profited at least $1 million per year from his call-routing platform and the tech-support fraud scheme.

9. Publishers like Company-1 published and sold malicious pop-ups that targeted United States residents located in the Western District of North Carolina and elsewhere in the furtherance of tech-support fraud. When the pop-ups appeared on victims' computers, the malicious pop-ups rendered the machine temporarily inoperable under the guise of detecting a supposed systemic computer failure. Designed with varying levels of maliciousness, some pop-ups masqueraded as "Blue Screens of Death," or BSOD for short. Other pop-ups were known as, among other things: (1) "porn pops," which flashed messages suggesting that the user's perusal of pornographic websites had resulted in the installation of harmful viruses; (2) "iOS pops," which misrepresented computer issues for Apple devices; and (3) "Desktop" or "Windows" pops, which misrepresented that Microsoft had remotely diagnosed an issue with

2

victims' computers. Publishers like Company-1 employed malicious pop-ups that misrepresented technical issues related to the services, software, and devices provided and/or sold by Microsoft or other legitimate computer software companies. Publishers would also configure some pop-ups to circumvent security protocols put into place by web browsers like Google Chrome. Regardless of the substance or configurations of the individual pop-ups, the end goal was the same: to delude victims into purchasing unnecessary tech-support services based on misrepresentations regarding the presence of computer viruses or computer or network infirmities. The pop-ups contained instructions for the computer user to call a phone number for computer repair: numbers that routed the calls to the call centers through NOLAN's TrackDrive platform.

10. To proliferate pop-ups over the internet, Company-1 purchased thousands of domain names for websites. NOLAN secured the rights to a rotating list of thousands of toll-free numbers that were embedded in the code of each pop-up. These toll-free numbers would connect to individual call centers through NOLAN's call routing platform. To ensure the malicious pop-ups worked as intended, *i.e.*, effectively locked victims' computers and displayed the correct phone numbers for use by NOLAN's call routing platform, NOLAN often viewed and tested publishers' pop-ups on his own test website. When telephone numbers used by NOLAN's call routing platform were identified as being associated with tech-support fraud, NOLAN "quarantined" those numbers by removing them from use for a short period of time to prevent further detection. NOLAN used communication platforms such as Skype to discuss the fraud scheme with co-conspirators.

11. Call centers, such as that which was owned and operated by Individual-1, paid employees to engage in telephone conversations with the caller victims. Call center employees relied on the misrepresentations displayed in the pop-ups to further misrepresent the presence of various computer infirmities on the victims' computers in order to trick victim callers into purchasing unnecessary tech-support services from the call centers. The call center employees would often also misrepresent to victims that they were employed by, or formally associated with, legitimate computer software companies, when in fact they were not. Many of the victims of the scheme were over the age of 55.

12. To receive payments from individual call centers for the tech-support fraud call traffic, publishers such as Company-1 used NOLAN and third-party brokers as payment intermediaries.

## Count One

(18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

13. Paragraphs 1 through 12 are re-alleged and incorporated by reference as if fully set forth herein.

14. From at least in or about April of 2016, through on or about August 2018, in Swain, Catawba, Mecklenburg, and Buncombe Counties (among others) in the Western District of North Carolina and elsewhere, the defendant,

**RICHARD PAUL NOLAN**,

did knowingly combine, confederate, conspire and agree with others known and unknown to the Grand Jury to commit the offense of wire fraud, a violation of Title 18, United States Code, Section 1343.

### Object of the Conspiracy

15. *Wire Fraud.* It was a part of and an object of the conspiracy that the defendant and others known and unknown to the Grand Jury, with the intent to defraud, having devised the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and by concealment of material facts, and for the purpose of executing and attempting to execute such scheme and artifice, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code Section 1343.

### Manner and Means

16. The defendant and his co-conspirators carried out the conspiracy through the manner and means described in Paragraphs 1 through 12 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

### NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offense for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The following property is subject to forfeiture in accordance with §§ 982 and/or 2461(c):

4

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

b. All property involved in such violations or traceable to property involved in such violations; and

c. If, as set forth in 21 U.S.C. § 853(p), any property described in the preceding subparagraph (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $2,000,000.00, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL

███████████████████████
GRAND JURY FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

*[signature]*
MATTHEW WARREN
ASSISTANT UNITED STATES ATTORNEY